FILED

2025 Sep-26  AM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ERIC ANTHONY BENSON, D.C.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case Number: 2:23-CV-0092-MHH** |
| | ) |
| **BBH WBMC, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Eric Anthony Benson, a retired chiropractic doctor, brings this action pursuant to the Alabama Medical Liability Act; Ala. Code §§ 6-5-480 et seq. and 6-5-540 et seq.; and the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd. (*See* Doc. 51).[1] Dr. Benson has named five defendants: BBH WBMC, LLC d/b/a Walker Baptist Medical Center; Alteon Health Alabama, LLC; Island Medical Alabama, LLC; Dr. Timothy Bruce Jordan; and CRNP Burley Joe Flanagin.[2] Dr. Benson's claims concern his admission to the emergency department

---

[1] References to "Doc(s). ___" are to the document number(s) of the pleadings, motions, orders, and other materials in the court file, as compiled and designated by the Clerk. Pinpoint citations are to the page of the electronically filed document in the CM/ECF system, which might not correspond to pagination printed on the "hard copy" of the document presented for filing. Citations to deposition testimony are first to the page of the electronically filed document and then, in parenthesis, the page of the reporter's transcript of the deposition.

[2] The Court has federal-question jurisdiction under 28 U.S.C. § 1331 over Dr. Benson's EMTALA claim against Walker Baptist and diversity jurisdiction under 28 U.S.C. § 1332(a)(1) over Dr.

at the Walker Baptist Medical Center in Jasper, Alabama, on January 22, 2021. Dr. Benson contends that he was seen and discharged without being properly diagnosed, treated, and stabilized, and that, as a result, he suffered a stroke a few days later that left him permanently disabled.

The case is before the Court on four motions: Walker Baptist's motion for partial summary judgment on the EMTALA claim, (Doc. 76); a joint motion for summary judgment from Alteon, Island Medical, and Dr. Jordan, (Doc. 77); Dr. Benson's motion to exclude testimony from Dr. Joseph C. Sullivan, III, an expert witness for Alteon, Dr. Jordan, and NP Flanagin, (Doc. 75); and a joint motion from Alteon, Island Medical, and Dr. Jordan to strike exhibits to Dr. Benson's expert motion, (Doc. 85).[3]

For the reasons discussed below, the Court resolves the summary judgment

---

Benson's other claims. Diversity jurisdiction extends to civil actions where the amount in controversy exceeds $75,000 and that are between citizens of different States. 28 U.S.C. § 1332(a)(1). Dr. Benson has pleaded that the amount-in-controversy requirement is met (Doc. 51, p. 2, ¶ 2). The parties are completely diverse. Dr. Benson is a citizen of Nebraska. (Doc. 51, p. 2, ¶ 4). Dr. Jordan and NP Flanagin are citizens of Alabama. (Doc. 51, p. 3, ¶¶ 5, 6; Doc. 53, p. 2, ¶¶ 5, 6). The remaining defendants are limited liability companies. For diversity purposes, they share the citizenship of each of their members. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004). Dr. Benson has alleged that none of the members of those defendants is a citizen of Nebraska, (Doc. 51), which is borne out by those defendants' initial disclosures. (*See* Doc. 29 (tracing the members of Walker Baptist and their citizenship to Alabama, Delaware, and Texas); Doc. 35 (tracing the members of Alteon and Island Medical and their citizenship to Delaware).

[3] The day before Alteon, Island Medical, and Dr. Jordan filed their motion for summary judgment (Doc. 77), Alteon and Dr. Jordan filed a similar motion for summary judgment, (Doc. 70). The Court has deemed that first motion moot. (Doc. 96).

motions and defers consideration of the *Daubert* motion and the associated motion to strike until the Court considers pretrial matters in this case.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "[A] litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn

3

statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012) ("Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper."). Because Walker Medical, Alteon, Island Medical, and Dr. Jordan filed the pending summary judgment motions, for purposes of those motions, the Court views the summary judgment evidence in the light most favorable to the non-movant, Dr. Benson.

## II.

Dr. Benson lives in Nebraska. On Friday, January 22, 2021, he was 60 years old and was visiting Alabama on a business trip. Driving alone in a rented vehicle, he stopped for lunch at a restaurant in Jasper. After he got back on the road, at approximately 3 p.m., he began to experience pain and muscle spasms in his neck. He then felt a strong headache and developed sweating, dizziness, nausea, vomiting, and difficulty swallowing. He called 911 for medical assistance. An ambulance arrived and transported him to the emergency department at the Walker Baptist Medical Center, a hospital operated by defendant Walker Baptist.

Dr. Benson was admitted to the emergency department at 4:59 p.m. He was

triaged by Markeia Fell, a registered nurse. She took his vital signs. His blood pressure was 143/86; his pulse was 64; his respiration was 17; his temperature was 97.7 degrees; and his oxygen saturation level was 98%. (Doc. 86-3, p. 36). RN Fell recorded a "pain score" of "0," indicating "no pain." (Doc. 86-3, p. 36). She noted complaints of dizziness and vomiting and indicated that Dr. Benson had stated that he had been "fine" until about one hour after he ate lunch. (Doc. 86-3, pp. 13, 36). On the hospital's "Patient Acuity" scale, RN Fell rated Dr. Benson as a "3." (Doc. 86-3, pp. 34, 36; Doc. 86-5, p. 21, tp. 81:10–13; Doc. 86-18, p. 5–12).[4] That was the most common score given to emergency department patients, (Doc. 86-16, p. 10, tp. 40:7–19), and indicated that RN Fell viewed Dr. Benson as not requiring immediate physician involvement, (Doc. 86-5, p. 22, tp. 85:12–15); *see also* Doc. 86-18, p. 8–9).

At 5:18 p.m., NP Flanagin, one of two nurse practitioners on duty in the emergency department, signed in on an electronic board to see Dr. Benson. (Doc. 86-16, p. 10, tp. 39–40). Two minutes later, RN Fell noted that Dr. Benson was "actively vomiting." (Doc. 86-3, p. 3). NP Flanagin first saw Dr. Benson at 5:35 p.m. (Doc. 86-3, p. 5). NP Flanagin noted Dr. Benson's complaints of dizziness, nausea, and vomiting; noted that the dizziness was worse with position changes; and

---

[4] The scale ranged from 1–5: "1" represented a need for immediate medical intervention and "5" represented that few medical resources were needed. (Doc. 86-3, pp. 34, 36; Doc. 86-5, p. 21; Doc. 86-18, 5–12).

5

that he felt "some tingling and numbness to the left side." (Doc. 86-3, p. 4). NP Flanagin also noted that Dr. Benson was "not in acute distress," and Dr. Benson's physical exam was unremarkable. (Doc. 86-3, pp. 5–6).

NP Flanagin ordered a battery of laboratory and imaging tests. (Doc. 86-16, pp. 12–13). Among those was a non-contrast computerized tomography – a CT – of Dr. Benson's brain. (Doc. 86-16, p. 13, tp. 49–50). NP Flanagin ordered that test to explore potential neurologic causes of Dr. Benson's symptoms of dizziness, numbness, and tingling. (Doc. 86-16, pp. 13, 16–17, 20–21). At 6:41 p.m., Radiologist Joseph Craft read the CT report. (Doc. 86-3, p. 9). Dr. Craft reported his findings as follows:

> Mild central and diffuse cortical atrophy. The ventricles and sulci are normal in size and configuration. There is no intra or extra-axial blood or fluid collection present. There is no mass or shift of midline. Trace posterior right ethmoidal sinus disease. The mastoid air cells are well pneumatized. The calvarium is intact without fracture.

(Doc. 86-3, p. 9). Dr. Craft then concluded that the CT revealed "[n]o acute intracranial findings." (Doc. 86-3, p. 9). The results of other tests and imaging also were unremarkable. Based on the head CT, the normal physical exam, and Dr. Benson's presentation, NP Flanagin eliminated a stroke and a transient ischemic attack – a TIA – as likely causes of Dr. Benson's symptoms. (Doc. 86-16, pp. 24–25).

RN Fell took Dr. Benson's vital signs two more times, at 6:29 p.m. and 8:37

p.m. (Doc. 86-3, pp. 40, 42). On the first check, Dr. Benson's blood pressure was 151/80, pulse 63, respiration 17, and oxygen saturation 95%. (Doc. 86-3, p. 40). On the second, his blood pressure was 145/84, pulse 76, respiration 17, and oxygen saturation again 95%. (Doc. 86-3, p. 42). At 9:19 p.m., NP Flanagin updated Dr. Benson's chart with a notation that his admission had involved a "Certified Emergency" and marked his "ED disposition" as "set to Discharge." (Doc. 86-3, p. 42). NP Flanagin made an entry on Dr. Benson's chart noting that Dr. Jordan was "assigned as Attending Physician." (Doc. 86-3, p. 42).

Dr. Jordan, board certified in emergency medicine, had been on duty as the supervising physician in the ED when Dr. Benson was admitted, (Doc. 71-1, p. 6, tp. 19–20), but Dr. Jordan's shift ended at 6:00 p.m., almost an hour after Dr. Benson entered the ED, (Doc. 71-1, p. 6, tp. 19–20). Dr. Cesar Ravelo relieved Dr. Benson as supervising physician. (Doc. 71-1, p. 6, tp. 19–20).[5] NP Flanagin testified that he understood that the hospital's electronic system would have populated Dr. Jordan as the supervising ED physician on duty and as the attending physician when NP Flanagin began charting notes on Dr. Benson's hospital record at 5:35 p.m. (Doc. 86-16, pp. 11–12; *see also* Doc. 71-18, pp. 17–18). To substitute Dr. Ravelo's name for Dr. Jordan's name as the on-duty and attending physician for Dr. Benson, NP Flanagin would have had to designate Dr. Ravelo's name when NP Flanigan signed

---

[5] Dr. Ravelo is not named as a defendant in this action.

7

the note after 9:00 p.m. (Doc. 86-16, pp. 11–12; *see also* Doc. 71-18, pp. 17–18).

Dr. Benson was discharged at 10:11 p.m. (Doc. 86-3, p. 43). The "diagnoses" section of Dr. Benson's "After Visit Summary" listed "dizziness," "acute nonintractable headache, unspecified headache type," and "non-intractable vomiting with nausea, unspecified vomiting type." (Doc. 86-3, p. 46; *see also* Doc. 86-3, pp. 1–10). Those conditions also appear on a "Problem List" within the "Discharge Information" section of Dr. Benson's record. (Doc. 86-3, p. 1). On that page, under an adjacent column used to indicate whether the condition was "Resolved," each of the three items has a corresponding entry, "No." (Doc. 86-3, p. 1). NP Flanagin designated Dr. Benson's disposition at discharge as "stable." (Doc. 86-3, pp. 2, 10).

Dr. Benson reports that, while he was in the emergency department, he complained of intense pain behind his left eye radiating into his left neck (Doc. 86-1 pp. 21, 25–26, tpp. 80, 97–98), and difficulty swallowing, (Doc. 86-1, p. 35, tpp. 136–37). He was not able to walk or stand. (Doc. 86-1, pp. 22, 24, 54–55, tpp. 82–83, 91, 211–12, 214–15). In his deposition, Dr. Benson testified that, at the time of discharge, a female hospital staff member hurried him out, stating, "We need you to leave. We're busy tonight, and we need your cubicle." (Doc. 86-1, p. 56, tp. 221). Dr. Benson asked for a wheelchair. (Doc. 86-1, p. 24, tp. 92:1–4). The staff member retrieved one, (Doc. 86-1, p. 57, tp. 222), and Dr. Benson was wheeled to the emergency room reception area. (Doc. 86-6, p. 4).

At discharge, Dr. Benson could not drive.  (Doc. 86-1, p. 29, tp. 113).  He texted a business associate at 10:16 p.m. that he was "still very unsteady on [his] feet."  (Doc. 86-6, p. 4).  The associate arranged for a taxi to pick Dr. Benson up at WBMC and take him to a hotel.  (Doc. 86-6, pp. 2–3).  Dr. Benson waited in the wheelchair in the emergency department area until the taxi arrived at about 11:30 p.m.  (Doc. 86-8, p. 1, ¶ 3).  The driver assisted Dr. Benson into the vehicle.  (Doc. 86-1, p. 29, tpp. 111–113; Doc. 86-8, pp. 1–2, ¶ 4).  At the hotel, the taxi driver helped Dr. Benson inside.  (Doc. 86-8, p. 2, ¶ 5).

When asked at his deposition whether his symptoms had improved between the time he arrived at the emergency department until he arrived at his hotel, Dr. Benson answered:  "No.  It was the same."  (Doc. 86-1, p. 30, tp. 115).  After checking in to the hotel, Dr. Benson was able to walk by himself to his hotel room, enter it, later return to the front desk, and return to his room.  (Doc. 86-1, p. 30, tp. 114–15).  Dr. Benson stated that he had to "use[ ] the walls" to go back and forth.  (Doc. 86-1, p. 30, tpp. 114–15).  At 12:38 a.m., Dr. Benson sent a text message to his wife, relating that, upon returning to his room for the night, he had been overwhelmed by dizziness and had "dry heaved" and emptied the remaining sushi out of his stomach.  (Doc. 86-1, p. 131).  He then went to bed.  (Doc. 86-1, p. 131).

Early the next morning, January 23, 2021, Dr. Jordan began another shift in the ED.  At 6:06 a.m., Dr. Jordan electronically signed an "attestation" on Dr.

Benson's chart which states:  "I was the Supervising Physician onsite, and consulted in the evaluation and care of this patient."  (Doc. 86-3, p. 4).  Dr. Jordan also checked a box on the system that added a note:  "The physician did not have a face to face encounter with the patient."  (Doc. 86-3, p. 4; *see also* Doc. 71-1, p. 8, tp. 28).  It is undisputed that Dr. Jordan was not involved in any aspect of Dr. Benson's care while Dr. Benson was in the emergency department.  (Doc. 71-1, p. 11, tp. 38:8–23).[6]

When Dr. Benson woke up in his hotel room at about 8 o'clock that same morning, his condition had improved.  (Doc. 86-1, pp. 30–31).  The tingling was gone, his nausea and vomiting had abated, and the left sided radiating eye pain had subsided, at least "enough to where it wasn't a big issue."  (Doc. 86-1, p. 30, tp. 115–16).  He still had some dizziness and lightheadedness but felt that he could drive.  (Doc. 86-1, p. 30, tpp. 116–17).  Dr. Benson decided to drive to Nashville, Tennessee, where he was scheduled to speak at a chiropractic seminar that afternoon.  (Doc. 86-1, pp. 8–9, 30–31).  A hotel employee gave Dr. Benson a ride to his rental car.  (Doc. 86-1, pp. 30–31).  Dr. Benson drove to Nashville without incident even though he was still experiencing some dizziness.  (Doc. 86-1, p. 31, tp. 118).

Dr. Benson gave a 15-minute seminar presentation, and he stayed for the

---

[6] NP Flanagin testified that he did not collaborate or speak with Dr. Jordan about Dr. Benson's care, and he does not see anything in Dr. Benson's chart that suggests otherwise.  (Doc. 86-16, pp. 15–16).  Similarly, Dr. Benson testified that he did not see anyone that he "perceived to be a doctor" other than NP Flanagin.  (Doc. 86-1, p. 25, tp. 95:1–6).

remainder of the program. (Doc. 86-1, p. 31, tp. 119:1–22). Afterwards, he went to dinner with colleagues. (Doc. 86-1, pp. 9, 58). After dinner, he returned to his hotel room and texted his wife at 10:12 p.m., stating, "I literally feel as though the last 24 hours did not occur." (Doc. 86-1, p. 65, tp. 256:13–14; Doc. 86-1, p. 176).

The following day, Dr. Benson awoke, went to the Nashville airport, and boarded a 7:15 a.m. flight to Dallas, a scheduled stopover on his way home to Nebraska. (Doc. 86-1, pp. 9, 11, 32). During that flight, the symptoms Dr. Benson reported in the emergency department returned. (Doc. 86-1, pp. 32, 35). He felt "slamming" pain through his left eye and head and tingling and numbness around his lips, and he had difficulty swallowing. (Doc. 86-1, p. 35, tpp. 134, 137). Dr. Benson advised a flight attendant that he would need an ambulance right away. (Doc. 86-1, p. 35, tp. 135). When the plane landed in Dallas, EMS personnel were at the gate, and they transported Dr. Benson to Baylor Scott & White Medical Center. (Doc. 86-1, p. 36, tpp. 138–39; *see also* Doc. 86-11). There, Dr. Benson was diagnosed with an acute ischemic stroke secondary to left vertebral artery dissection/occlusion and Wallenberg syndrome. (Doc. 86-11, pp. 7–8). As a result of the stroke, Dr. Benson is permanently disabled. (*See* Doc. 86-1, pp. 14–15, tpp. 53–54; Doc. 86-15, p. 7). Dr. Benson filed this action on January 20, 2023. (Doc. 1).

# III.

\*\*\*

The Court first considers Walker Baptist's motion for summary judgment on Dr. Benson's EMTALA claim. Congress enacted EMTALA "to prevent 'patient dumping,' which is the 'practice of some hospitals turning away or transferring indigent patients without evaluation or treatment.'" *Smith as next friend of MS v. Crisp Reg'l Hosp., Inc.*, 985 F.3d 1306, 1307–08 (11th Cir. 2021) (quoting *Harry v. Marchant*, 291 F.3d 767, 768 (11th Cir. 2002) (en banc)). EMTALA authorizes a private cause of action for damages by an individual "who suffers personal harm as a direct result" of a participating hospital's violation of the EMTALA's substantive provisions. 42 U.S.C. § 1395dd(d)(2)(A). Dr. Benson contends that Walker Baptist violated 42 U.S.C. § 1395dd(b), a provision of EMTALA that requires a covered hospital, if its screening "determines that the individual has an emergency medical condition," to provide "such further medical examination and such treatment as may be required to stabilize the medical condition" before discharging the individual or transferring the individual to another facility. 42 U.S.C. § 1395dd(b); *see also Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 250–51 (1999); *Harry*, 291 F.3d at 770-71.[7]

---

[7] Under EMTALA, "transfer" includes discharge. 42 U.S.C. § 1395dd(e)(4); *Harry*, 291 F.3d at 768 n.1.

To succeed on a claim under § 1395dd(b), a plaintiff must prove that: "(1) the patient had an emergency medical condition; (2) the hospital knew of the condition; (3) the patient was not stabilized before being transferred; and (4) the hospital neither obtained the patient's consent to transfer nor completed a certificate indicating the transfer would be beneficial to the patient." *Harry*, 291 F.3d at 774 (footnote added); *see also Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994). For purposes of EMTALA, an "emergency medical condition" means:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
>
>> (i) placing the health of the individual … in serious jeopardy,
>>
>> (ii) serious impairment to bodily functions, or
>>
>> (iii) serious dysfunction of any bodily organ or part; ….

42 U.S.C. § 1395dd(e)(1)(A). The phrase "to stabilize" as used in § 1395dd(b)(1)(A) with respect to an "emergency medical condition" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility …." 42 U.S.C. § 1395dd(e)(3)(A) (footnote added); *see also Harry*, 291 F.3d at 770–71.

The Eleventh Circuit has cautioned that the "focus of the Act is narrow" and

that EMTALA "'was not intended to be a federal malpractice statute'" or "'to establish guidelines for patient care.'" *Smith*, 985 F.3d at 1308 (quoting *Harry*, 291 F.3d at 770, 773). EMTALA "'is not designed to redress a negligent diagnosis by the hospital.'" *Smith,* 985 F.3d at 1308 (quoting *Holcomb*, 30 F.3d at 117). "EMTALA does not hold hospitals accountable for failing to stabilize conditions of which they were not aware, or even conditions of which they should have been aware." *Williamson v. Roth*, 120 F. Supp. 2d 1327, 1335 (M.D. Fla. 2000) (internal quotation marks and citation omitted). In other words, a plaintiff must prove that the hospital actually knew that the patient had an emergency medical condition; constructive knowledge is not sufficient. *Williams,* 120 F. Supp. at 1335; *Holcomb v. Humana Med. Corp.*, 831 F. Supp. 829, 833 (M.D. Ala. 1993), *aff'd sub nom. Holcomb v. Monahan*, 30 F.3d 116 (11th Cir. 1994); *Morgan v. North MS Med. Ctr., Inc.*, 403 F. Supp. 2d 1115, 1130 (S.D. Ala. 2005) ("Analysis by hindsight cannot impose EMTALA liability; rather, 'a hospital must actually perceive the seriousness of the medical condition and nevertheless fail to act to stabilize it.'") (quoting *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 145 (4th Cir. 1996)); *Urban v. King*, 43 F.3d 523, 525 (10th Cir. 1994) ("The hospital cannot be held to stabilize an emergency situation without knowing an emergency exists."); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir. 1990) ("If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to

stabilize a known emergency condition.").

Walker Baptist's motion for summary judgment touches on the first three elements of a claim under § 1395dd(b). Specifically, Walker Baptist contends that, even if Dr. Benson had an emergency medical condition, Walker Baptist did not have actual knowledge of the condition. Walker Baptist adds that, to the extent it might be deemed to have known Dr. Benson had an emergency medical condition, the condition was stabilized when he was discharged. Walker Baptist argues that EMTALA liability cannot rest on an alleged failure to diagnose an emergency condition.

Dr. Benson acknowledges that he was not diagnosed with a stroke or a dissection and/or occlusion of his vertebral artery until more than one day after he was discharged from Walker Baptist. (*See* Doc. 87, pp. 1–2). Dr. Benson also concedes, at least nominally, that his EMTALA claim "does not rest—in theory or in fact—on any proof that the hospital was negligent." (Doc. 87, p. 5). Dr. Benson asserts that his claim rests "entirely on Walker Baptist ED providers' failure to treat those emergent conditions those providers actually knew existed." (Doc. 87, p. 2 (internal quotation marks and citation omitted)). Dr. Benson asserts that because Walker Baptist was aware of the "emergency medical conditions" he presented at the emergency department – severe headache, acute dizziness, nausea, vomiting, left-sided tingling and numbness, compromised balance, and an inability to walk

independently – Walker Baptist had a duty under § 1395dd(b) "to stabilize" with "further medical examination and … treatment" prior to discharge. (Doc. 87, pp. 3, 24, 27, 30, 33, 36).

Dr. Benson has not cited caselaw to support his symptoms theory of "emergency medical condition" for purposes of EMTALA. The language of EMTALA indicates that "symptoms" alone, even symptoms that might be deemed "acute" or "sever[e]," do not establish the existence of an "emergency medical condition." 42 U.S.C. § 1395dd(e)(1)(A). Rather, EMTALA treats "symptoms" as "manifest[ations]," § 1395dd(e)(1)(A), that is, "perceptible, outward, or visible expression[s]," https://www.merriam-webster.com/dictionary/manifestation (last visited September 25, 2025), of an underlying "medical condition," which, in turn, may or may not qualify as an "emergency medical condition." To give rise to an "emergency" in this context, a patient's symptoms or condition must be "such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual in serious jeopardy, … (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). A plaintiff must show that the hospital had actual knowledge not only of "acute symptoms" of a "medical condition" but also that, without "immediate medical attention," the patient's "health [is] in serious jeopardy, or that there was an imminent danger to … bodily functions or organs."

16

*Mitchell*, 1992 WL 96310, at *6; *see also Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 893 (7th Cir. 2003) ("'Emergency medical condition' means a medical condition manifesting itself by acute symptoms of sufficient severity that the absence of immediate medical attention could reasonably result in 'imminent danger of death or serious disability.'") (quoting 42 U.S.C. § 1395dd(e)(1); *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990)).

Some kinds of acute symptoms, such as severe breathing problems, cardiac arrest, or active seizures, may trigger the duty under EMTALA to provide stabilizing treatment, even if the underlying "medical condition" causing the symptoms is unclear. *See Matter of Baby K*, 16 F.3d 590, 594 (4th Cir. 1994) (infant's respiratory distress would be reasonably expected to cause serious impairment of her bodily functions without immediate treatment); *Reynolds*, 218 F.3d at 85 ("It may be that in exceptional circumstances of proof of an existing emergency need for immediate stabilization, a hospital would have a duty of stabilization under EMTALA."). Many, if not most, symptoms do not fall into that category. "[M]ultiple diagnoses, emergency conditions or not, often exhibit the same or similar symptoms." *Koel v. Citizens Med. Ctr., Inc.*, 128 F.4th 1329, 1337 n.4 (10th Cir. 2025). For example, while "nausea and dizziness … might well herald the onset of an emergency medical condition in the case of a hypertensive diabetic," *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995), those symptoms "alone do not necessarily indicate

that an emergency medical condition exists," *Reynolds*, 218 F.3d at 82. *See McClure v. Parvis*, 294 F. Supp. 3d 318, 326 (E.D. Pa. 2018) ("Symptoms like vomiting and vision problems, in isolation, may not constitute an emergency medical condition.").

Therefore, the fact that a hospital has actual knowledge of symptoms that may accompany an emergency medical condition does not equate to actual knowledge of an *actual* emergency medical condition triggering a duty to stabilize under EMTALA. *See Koel*, 128 F.4th at 1337; *Elmhirst v. McLaren Northern Michigan*, 726 Fed. Appx. 439, 440-41, 444-45 (6th Cir. 2018); *Guzman v. Memorial Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 507 (S.D. Tex. 2009), *aff'd*, 409 Fed. Appx. 769 (5th Cir. 2011); *Stiles v. Tenet Hosps. Ltd.*, No. EP-09-CA-463-FM, 2011 WL 13070423, at *7 (W.D. Tex. Aug. 16, 2011) ("Under the language of the statute, Hospital staff had to know, not only that [the patient] had severe pain and other symptoms, but that these symptoms were in fact manifestations of a medical condition requiring immediate treatment."), *aff'd*, 494 Fed. Appx. 432 (5th Cir. 2012); *Reynolds*, 218 F.3d at 85 ("It is doubtful that the text of the statute would support liability under the stabilization provision for a patient who had [deep vein thrombosis], absent evidence sufficient to support a finding that the hospital knew of his DVT.").

To be sure, Dr. Benson can show that nurse practitioners in the emergency department knew that he was suffering from acute symptoms including headache,

dizziness, vomiting, nausea, weakness, numbness, and trouble walking, but he has not cited evidence that the nurse practitioners actually knew that those symptoms were manifestations of a medical condition that, absent prompt medical intervention, would be expected to result in death, disability, or similarly "serious" health effects, as enumerated in § 1395dd(e)(1)(A).  For starters, the CT scan of Dr. Benson's head revealed "[n]o acute intracranial findings."  (Doc. 86-3, p. 9).  As discussed, the results of other tests and imaging were unremarkable.  Based on these test results, NP Flanagin eliminated TIA and stroke as likely causes of Dr. Benson's symptoms. (Doc. 86-16, pp. 24–25).  At discharge, Dr. Benson's condition was "stable," and his vital signs were largely consistent and unremarkable throughout his admission. *See Holcomb*, 30 F.3d at 117 (holding that the plaintiff failed to provide evidence that the hospital knew the patient had a emergency medical condition where, at the time of discharge, the patient's "vital signs had stabilized"); *Cleland*, 917 F.2d at 269 (while patient died about a day after four-hour ED admission, hospital was not aware of an emergency medical condition where complaints of abdominal cramps and vomiting were erroneously diagnosed as just the flu and, "to all appearances, the plaintiff's condition was stable").

Dr. Benson cites entries NP Flanagin made in Dr. Benson's record that indicate that Dr. Benson's vomiting, headache, and dizziness had not "resolved," (*see* Doc. 86-3, p. 1), but whether Dr. Benson's symptoms persisted at discharge is

not the issue. By then, he had been screened and diagnosed, correctly or not, as having symptoms that the practitioners treating Dr. Benson regarded as "nonintractable," *i.e.*, easily relieved or cured in light of test results that caused the practitioners to rule out conditions like stroke or TIA. *See* https://www.merriam-webster.com/dictionary/intractable#medical Dictionary (defining "intractable" to mean "not easily relieved or cured"); *see also* Doc. 86-16, p. 33, tp. 131 (NP Flanagin's testimony that "just by the choice that I put non-intractable headache [and vomiting]" meant that they had been "treatable at the very least"). Thus, evidence of Dr. Benson's symptoms does not give rise to liability under § 1395dd(b) on the record in this case. *See Stiles v. Tenet Hosps. Ltd.*, 494 Fed. Appx. 432, 437 (5th Cir. 2012) ("The fact that Stiles told a nurse, as he was being discharged, that he was still in as much pain as when he arrived is immaterial; he had already been diagnosed, correctly or not, with a benign headache. Pain alone cannot impute actual knowledge of an emergency medical situation to the hospital."); *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1135–36, 1140 (8th Cir. 1996) (en banc) (despite subsequent determination that patient had a broken sternum, rib, and vertebra, where defendant hospital had erroneously diagnosed patient with muscle spasms, hospital was not aware of an emergency medical condition, notwithstanding patient's continuing complaints of chest and back pain, popping noises in his chest, and pleas to be admitted as an inpatient); *Gardner v. Elmore Cmty. Hosp.*, 64 F.

20

Supp. 2d 1195, 1204 (M.D. Ala. 1999) (plaintiffs could not prevail under § 1395dd(b) notwithstanding that they "appeared to be injured and in pain upon discharge"; hospital diagnosed only "multiple soft-tissue trauma," and "the fact that [the] injuries proved to be much more serious than Defendant Hospital believed them to be does not impact [its] liability").

Dr. Benson points to a note in his chart documenting his emergency department admission as a "certified emergency." (Doc. 86-3, pp. 31, 42). NP Flanagin made that entry at 9:21 p.m. as he was completing his charting and preparing for Dr. Benson's discharge. The Court cannot excise that notation from other evidence that demonstrates that Walker Baptist lacked the knowledge required for EMTALA liability. *See Fewins v. Granbury Hosp. Corp.*, 662 Fed. Appx. 327, 334 (5th Cir. 2016) (affirming district court's ruling that documenting a "certified medical emergency" was not the same as finding an "emergency medical condition" under EMTALA). Because the record establishes without genuine dispute that Walker Baptist did not have actual knowledge that Dr. Benson had an emergency medical condition, Walker Baptist is entitled to summary judgment on Dr. Benson's EMTALA claim. *See Elmhirst*, 726 Fed. Appx. at 440–41, 444–45 (affirming dismissal of § 1395dd(b) claim even though the patient "exhibited symptoms consistent with … a dangerous condition known as vertebral dissection," including

dizziness, headache, and nausea, where hospital never diagnosed such condition).[8]

***

The Court turns to Dr. Jordan's motion for summary judgment on Dr. Benson's medical malpractice claim against him.  (*See* Doc. 51, pp. 24–32, Count Two).  Alabama substantive law governs this claim.  *See Looney v. Moore*, 886 F.3d 1058, 1065 (11th Cir. 2018); *Ex parte Vanderwall*, 201 So. 3d 525, 533 (Ala. 2015). To prevail, Dr. Benson must produce evidence to prove: "1) the appropriate standard of care, 2) that the defendant health-care provider breached that standard of care, and 3) a proximate causal connection between the health-care provider's alleged breach and the identified injury." *Kraselsky v. Calderwood*, 166 So. 3d 115, 118 (Ala. 2014).

Dr. Jordan argues that there is insufficient evidence that he breached the standard of care.  Under the Alabama Medical Liability Act, the standard of care is "that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases."  Ala. Code § 6-5-542(2).  A "breach of the standard of care is the failure by a health care provider to comply with the standard of care, which

---

[8] Walker Baptist also argues that it is entitled to summary judgment on the EMTALA claim based on the two-year statute of limitations in 42 U.S.C. § 1395dd(d)(2)(C).  (Doc. 82, p. 13–17).  The Court need not reach this affirmative defense because Dr. Benson has not presented sufficient evidence to support a stabilization claim under § 1395dd(b).

failure proximately causes personal injury or wrongful death." Ala. Code § 6-5-542(2). "Establishing the applicable standard of care and the alleged breach of that standard of care ordinarily requires expert testimony from a 'similarly situated health-care provider,' as that term is defined in [Ala. Code] § 6-5-548." *Morgan v. Publix Super Markets, Inc.*, 138 So. 3d 982, 986 (Ala. 2013) (internal quotation marks and citation omitted).

To establish the standard of care and its breach, Dr. Benson relies on expert testimony from Joshua N. Goldstein, an emergency physician and professor of emergency medicine at Harvard Medical School. (*See* Docs. 88-1, 88-2, 71-5). No one objects to the admissibility of Dr. Goldstein's testimony, but Dr. Jordan argues that Dr. Goldstein's testimony is not sufficient to raise an issue of fact regarding Dr. Benson's AMLA claim.

As discussed, Dr. Jordan was on duty as the supervising physician in the emergency department when Dr. Benson arrived at Walker Baptist at 4:59 p.m. on January 22nd. (Doc. 86-16, p. 8, tp. 29). Dr. Jordan is listed on the hospital's electronic records system as having been "assigned as Attending Physician." (Doc. 86-3, p. 42). Dr. Jordan does not recall Dr. Benson. (Doc. 71-1, pp. 8, 10). NP Flanagin identified Dr. Jordan as the assigned attending physician at 9:20 p.m., just as NP Flanagin completed his charting for Dr. Benson and documented at 10:11 p.m that Dr. Benson was ready for discharge. (Doc. 71-1, pp. 8, 10; *see also* Doc.

86-16, p. 11, tp. 43).  By then, Dr. Jordan's shift was over; Dr. Ravelo had relieved Dr. Jordan as the supervising physician at 6 p.m.  (Doc. 86-16, p. 8, tp. 30–31). Thus, Dr. Jordan was the supervising physician in Walker Baptist's emergency department for only the first hour of Dr. Benson's approximately five-hour admission.  When Dr. Benson underwent an EKG at 5:45 p.m., RN Fell furnished those results at 6:00 p.m. to Dr. Ravelo, not to Dr. Jordan.  (Doc. 86-3, pp. 33, 38; Doc. 86-5, pp. 28–30).

It is undisputed that Dr. Jordan's only action related to Dr. Benson's admission occurred after Dr. Benson's discharge.  When Dr. Jordan began his shift early on the morning of January 23, 2021, he received Dr. Benson's chart in his electronic inbox and signed the attestation that he "was the Supervising Physician onsite, and consulted in the evaluation and care of this patient."  (Doc. 86-3, p. 4). Dr. Jordan noted that he "did not have a face[-]to[-] face encounter with the patient." (Doc. 86-3, p. 4).  It is undisputed that Dr. Jordan not only never saw Dr. Benson but also that Dr. Jordan was not consulted or otherwise involved in Dr. Benson's care at Walker Baptist.  Dr. Jordan has testified that the "consulted in the evaluation and care" language in the attestation that accompanied his electronic signature on Dr. Benson's medical record automatically populated in the charting system, and he could not alter the language.  (Doc. 71-1, pp. 8–9).  Dr. Jordan explained that if he did not sign the attestation on patient charts in his inbox, the charts would remain

there.  (Doc. 71-1, p. 10, tp. 33–34).  Under hospital policy, Dr. Jordan as the duty physician had to review and sign Dr. Benson's chart.  (Doc. 71-18, pp. 16–17).

Dr. Jordan does not recall reviewing Dr. Benson's chart.  (Doc. 71-1, p. 10, tp. 33, 35).  Dr. Jordan acknowledges that he "might just spend a very brief time glancing" at a patient's chart, only "looking at the primary complaint and the discharge diagnosis," which "might not take [him] very long."  (Doc. 71-1, p. 10, tp. 33, 35).  An audit trail of the hospital's electronic charting system indicates that Dr. Jordan viewed Dr. Benson's chart for 11 seconds before Dr. Jordan added his electronic signature to the chart.  (Doc. 89, p. 13 (citing Doc. 86-9)).  Dr. Jordan concedes that he did not follow up with NP Flanagin or anyone else who provided care to Dr. Benson in the emergency department.  (Doc. 71-1, p. 11, tp. 38).

Dr. Benson contends that Dr. Jordan breached the standard of care because, as Dr. Goldstein testified, he "should have been involved" in Dr. Benson's care but wasn't.  (Doc. 89, p. 27) (quoting Doc. 71-5, p. 18, tp. 67).  Dr. Benson cites Dr. Goldstein's opinion that Dr. Jordan should have been "involved in real time to supervise" the care NP Flanagin provided.  (Doc. 89, p. 23) (quoting Doc. 88-2, p. 4).  But Dr. Jordan was on duty in the emergency department as the supervising physician only from the time Dr. Benson arrived at 4:59 p.m. on January 22nd until 6:00 p.m. when Dr. Jordan's January 22 shift ended.  There was little for Dr. Jordan to supervise in that 60-minute period as RN Fell triaged Dr. Benson, gathering his

complaints, vital signs, and pain score and evaluating Dr. Benson on Walker Baptist's "Patient Acuity" scale. (Doc. 86-3, pp. 24, 36).[9] Dr. Benson also underwent an EKG during the one-hour period that Dr. Jordan was on duty in the emergency department; the results became available as Dr. Jordan's shift ended. (*See* Doc. 89, pp. 38–43). Based on her assessment of Dr. Benson, RN Fell noted that Dr. Benson did not require immediate physician involvement, (Doc. 86-5, p. 22, tp. 85:12–15); *see also* Doc. 86-18, pp. 8–9).

Though Dr. Goldstein opines in a conclusory fashion that Dr. Jordan should have been more involved in Dr. Benson's care and in the supervision of NP Flanagin, Dr. Goldstein has not explained how Dr. Jordan could have met that standard under these circumstances. Given Dr. Goldstein's failure to account for the fact that Dr. Jordan was on duty only for a brief segment of Dr. Benson's emergency department admission and that most of that segment was occupied with early triage activity, Dr. Goldstein's testimony does not suffice to establish the standard of care that applied to Dr. Jordan or a breach of that standard. *See McMickens v. Callahan*, 533 So. 2d 579, 581 (Ala. 1988) (evidence that a provider

---

[9] RN Morgan Mobley initially saw Dr. Benson in the emergency department. (Doc. 86-3, p. 3). NP Fell first encountered Dr. Benson at 5:20 p.m. (Doc. 86-3, p. 3). NP Fell examined Dr. Benson and began the triage process at 5:35 p.m. (*See* Doc. 86-3, pp. 4–6, 38–43). Dr. Benson's medical records suggest that NP Flanigan began working with NP Fell at approximately 5:35 p.m. (Doc. 86-3, p. 5). Initial labs were collected on Dr. Benson at 5:49 p.m. (Doc. 86-3, p. 6). Dr. Benson recognizes that "Dr. Goldstein takes no particular issue in this case with the mere fact that [NP] Flanagin was permitted to conduct a history, physical exam, and initial workup relevant to [Dr.] Benson's presenting signs and symptoms." (Doc. 89, p. 22).

26

should check the patient's interocular pressure "frequently" was too general to establish the standard of care and allow a finding of breach); *Smith v. Bama Urgent Med., Inc.*, No. 7:08-CV-1546-RDP, 2012 WL 13088764, at *6 (N.D. Ala. Feb. 29, 2012) (granting summary judgment where "bare allegations of negligence on Bama Urgent's part of a failure to train or supervise [a non-employee physician at its facility] were insufficient"); *see generally* Ala. Code § 6-5-551 (requiring a complaint in a medical malpractice action to contain "a detailed specification and factual description of each act and omission alleged by the plaintiff to render the healthcare provider liable to plaintiff").

Dr. Benson falls back on Dr. Jordan's acknowledgment that during the period he is on duty as the supervising physician, he is "ultimately responsible … for the patients in the emergency room." (Doc. 71-1, p. 7, tp. 24). But that statement proves little in this case, given the short time that Dr. Jordan was on duty during Dr. Benson's time in the emergency department. Dr. Jordan's responsibility ended when his shift ended and Dr. Ravelo replaced Dr. Jordan as the on-duty ED physician. Dr. Benson has not identified evidence that suggests that NP Flanigan breached a duty of care during Dr. Benson's first hour in the emergency department such that Dr. Jordan might have breached a duty to adequately supervise NP Flanigan.

More fundamentally, Dr. Benson essentially seeks to hold Dr. Jordan

vicariously liable for the actions of NP Flanagin. Under Alabama law, a physician is not liable under a theory of respondeat superior for the negligence of a nurse practitioner employed by a third-party, even if the physician oversees the nurse's work, if the physician does not have the ability to select the nurse. *McGathey v. Brookwood Health Services, Inc.*, 143 So. 3d 95, 103 (Ala. 2013); *Ware v. Timmons*, 954 So. 2d 545, 549 (Ala. 2006). This rule applies when the physician and the nurse subject to the physician's direction are co-employees of a third party. *See Ware*, 954 So. 2d at 556.

Dr. Jordan and NP Flanagin work for Alteon. Dr. Benson does not allege, and has not offered proof, that Dr. Jordan hired or otherwise selected NP Flanagin. Thus, Dr. Jordan cannot be vicariously liable for medical negligence that Dr. Benson attributes to NP Flanagin. *See McGathey,* 143 So. 3d at 103; *Ware,* 954 So. 2d at 549.

For these reasons, the Court grants Dr. Jordan's motion for summary judgment concerning Dr. Benson's allegation that Dr. Jordan breached the standard of care by failing to be "involved" or provide "real time supervision" of Dr. Benson's care in the emergency department.

Dr. Benson also contends that Dr. Jordan breached the standard of care because when Dr. Jordan began a new shift as the ED supervising physician at 6 a.m. on January 22, Dr. Jordan had to review Dr. Benson's chart and either contact

28

NP Flanagin and ask him about the case because there was not enough information in the chart to determine whether Dr. Benson's dizziness had been properly evaluated, or contact Dr. Benson to ask how he was feeling and gather additional information about his case. (Doc. 71-5, pp. 20–21, tp. 72–74). Dr. Benson argues that Dr. Jordan breached that standard of care by signing Dr. Benson's chart for 11 seconds and conducting no follow up with NP Flanagin or Dr. Benson. (*See* Doc. 89, pp. 29–31).

Dr. Jordan did not acknowledge or address this argument in his summary judgment briefs. (*See* Doc. 78, pp. 11–14; Doc. 95, pp. 2–6). Therefore, as to Dr. Benson's "failure-to-follow-up" theory, Dr. Jordan has not carried his burden to demonstrate there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Jackson v. City of Birmingham*, 364 F. Supp. 3d 1310, 1313 & n.1 (N.D. Ala. 2019). The Court denies Dr. Jordan's motion for summary judgment as it relates to this AMLA theory.

***

Turning to Dr. Benson's claims against defendants Alteon and Island Medical, these defendants argue that, as a matter of law, they cannot be vicariously liable for purported medical negligence by either NP Flanagin or Dr. Jordan. (Doc. 78, pp. 14–18).[10] NP Flanigan and Dr. Jordan had an employment agreement with Alteon.

---

[10] In their motion for summary judgment, Alteon and Island Medical refer to themselves

(Doc. 71-4; Doc. 86-16, pp. 69–75). In turn, Alteon had an "Agreement for Emergency Department Coverage" with Walker Baptist to supply physicians and other providers, including nurse practitioners, to staff the Walker Baptist emergency department. (Doc. 71-3). NP Flanagin and Dr. Jordan worked in the department pursuant to the coverage agreement. Alteon argues that it cannot be vicariously liable for negligence on the part of Dr. Jordan or NP Flanagin because both were its independent contractors, not employees.

"[U]nder the doctrine of respondeat superior a principal is vicariously liable for the torts of its agent … committed within the line and scope of the agent's employment." *Bain*, 233 So. 3d at 955 (quoting *Martin*, 695 So. 2d at 1177) (alteration added) (emphasis removed). "To recover … under the theory of respondeat superior, it is necessary for the plaintiff to establish the status of employer and employee—master and servant." *Ware*, 954 So. 2d at 549 (quoting *Hendley v. Springhill Mem'l Hosp.*, 575 So. 2d 547, 550 (Ala. 1990)) (alteration added). In contrast, a defendant ordinarily is not liable for the negligence of its independent contractor. *Bain*, 233 So. 3d at 955; *Humana*, 597 So. 2d at 669. "The test for determining whether a person is an agent or employee of another, rather than an

---

collectively as "Alteon." (Doc. 78, p. 1). According to their corporate disclosures, the companies are affiliated LLCs owned by another LLC. (Doc. 35, p. 2). Dr. Benson also refers to he defendants collectively as "Alteon" and draws no material distinction between them. (Doc. 89, pp. 1, 2, 31–38). The Court will follow suit.

independent contractor with that other person, is whether that other person has reserved the right of control over the means and method by which the person's work will be performed, whether or not the right of control is actually exercised." *Martin*, 695 So. 2d at 1177 (citing *Alabama Power Co. v. Beam*, 472 So. 2d 619 (Ala. 1985)).

Where there is a written contract between the defendant and a worker alleged to have been negligent, a court considers how the agreement characterizes the relationship between the worker and the defendant. *See Daniels v. Mead Coated Bd., a Subsidiary of Mead Corp.*, 858 F. Supp. 1103, 1105 (M.D. Ala. 1994), *aff'd sub nom. Daniels v. Mead Coated Bd., Inc.*, 50 F.3d 1038 (11th Cir. 1995) (table); *Pugh v. Butler Tel. Co.*, 512 So. 2d 1317, 1318 (Ala. 1987). Because working relationships take many forms, each case turns on its facts, and "all features of the relationship are considered together." *Donaldson v. Country Mut. Ins. Co.*, 291 So. 3d 1172, 1175–76 (Ala. 2019) (citations and internal quotation marks omitted); *see also* Restatement (2d) of Agency § 220 (1957) .

Alteon points to the Coverage Agreement. (*See* Doc. 78, pp. 6, 17–18; Doc. 95, pp. 6–7). The agreement states that physicians Alteon furnishes to staff the emergency department at Walker Baptist "are acting as independent contractors and shall not be considered employees" of the hospital. (Doc. 71-3, p. 8, ¶ 1(m)). Alteon also cites a provision that emergency department providers were required to supply "medical treatment which may be necessary in accordance with sound medical

practice." (Doc. 71-3, p. 2, ¶ 1(a)(1)). The agreement only speaks to the physicians' relationship to Walker Baptist, not to Alteon. Here, the question is whether Dr. Jordan and NP Flanagin were employees or independent contractors of Alteon. That is determined by reference to the employment agreements between Alteon and Dr. Jordan and NP Flanagin, as well as the actual circumstances attending each practitioner's work relationship with Alteon. *See Brilliant*, 582 So. 2d at 516–17; *Donaldson*, 291 So. 3d at 1175–76.

Those contracts are labeled "Employment Agreements." (Doc. 71-4, p. 2; Doc. 86-16, p. 69). Though "the mere existence of a document styled 'employment agreement' [should not] lead inexorably to the conclusion that [a] party is an employee," *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 450 (2003), the label is relevant, as is the fact that the Employment Agreements repeatedly and uniformly refer to the relationship between Alteon and the practitioners as one of "employment." (*See, e.g.*, Doc. 71-4, p. 2, ¶ 1 ("Company agrees to employ Provider and Provider agrees to accept employment with Company …."); Doc. 71-4, ¶¶ 1, 2.1 (acknowledging an "employment relationship"); Doc. 71-4, ¶ 2.2 (obligating Dr. Jordan to notify Alteon of certain events should they "occur during employment"); Doc. 71-4, pp. 2–3, ¶ 2.3 (addressing conditions and privileges of "[Dr. Jordan's] employment with [Alteon]"); Doc. 86-16, p. 69 (introduction designating Alteon as "Employer" and NP Flanagin as "Employee");

Doc. 86-16, ¶ 1 ("Employer does hereby employ Employee and Employee accepts employment with Employer ....")).  The language reflects the parties' intent and understanding of their agreement.  *See Ex parte Board of Sch. Comm'rs of Mobile Cnty.*, 178 So. 63, 65 (Ala. 1937) ("[T]he parties being presumed to know the legal import of their contracts, an express stipulation on the subject [of whether workers are to be considered employees or independent contractors] is to be taken in connection with the whole, and not disregarded unless the whole is inconsistent with the agreed meaning of the contract.").  In the absence of conflicting provisions in the contract or of evidence of conflicting actual circumstances of the relationship, the parties' characterization in their written agreement generally prevails.  *See Ex parte Board of Sch. Comm'rs of Mobile Cnty.*, 178 So. at 65; *Brillant*, 586 So. 2d at 516–17.

Alteon points out that Dr. Jordan's agreement includes an acknowledgment that he must "exercise his … professional medical judgment in accordance with the applicable standard of care," (Doc. 71-4, p. 2, ¶ 2.1), "and the employment relationship shall not improperly influence [Dr. Jordan's] professional medical judgment or the provider-patient relationship," (Doc. 71-4, p. 2, ¶ 2.1).  Alteon does not identify similar provisions in NP Flanagin's agreement.  The provisions from Dr. Jordan's agreement do not preclude an employment relationship.  Indeed, the second provision explicitly acknowledges an "employment relationship." (Doc. 71-

4, p. 2, ¶ 2.1).

The Alteon employment agreements require Dr. Jordan and NP Flanagin, in the "performance of their employment duties" to "follow the direction" of Alteon "at all times," only "subject to" instances in which Dr. Jordan and NP Flanagin would be "obligat[ed]" to conduct themselves otherwise by "applicable law and rules of professional responsibility." (Doc. 71-4, p. 5, ¶ 2.16; Doc. 86-16, pp. 69–70, ¶ 2). That reserved right of broad control is not negated by Dr. Jordan's acknowledgement that he must comply with the standard of care and use his "professional medical judgment." Indeed, "[a]mid … broad networks of control [over modern healthcare professionals by hospitals, universities, clinics, other practitioners, and corporations of all kinds], … courts overwhelmingly recognize and apply the principles of vicarious liability in the world of modern medicine." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1240–41 (11th Cir. 2014) (citing, inter alia, *University of Ala. Health Servs. Found., P.C. v. Bush ex rel. Bush*, 638 So. 2d 794, 799 (Ala. 1994)) (alterations added). Alabama courts recognize vicarious liability for negligent treatment by medical professionals. *See, e.g., Springhill Hosps., Inc. v. West*, 388 So. 3d 648 (Ala. 2023); *Boudreaux v. Pettaway*, 108 So. 3d 486 (Ala. 2012); *Hauseman v. Univ. of Alabama Health Servs. Found.*, 793 So. 2d 730, 736 (Ala. 2000); *Briggins v. Shelby Med. Ctr.*, 585 So. 2d 912 (Ala. 1991).

The terms of Alteon's employment agreements expressly designating an "employment relationship" and providing for a right of control in Alteon with respect work duties suffice to create a genuine factual dispute as to whether Dr. Jordan and NP Flanagin were employees of Alteon. *See Bravo v. United States*, 532 F.3d 1154, 1159–60 (11th Cir. 2008) (finding that the a physician was an employee of a naval hospital rather than an independent contractor where contract language made clear that the naval hospital reserved the right to direct the physician in the course of patient care activities); *Warren Webster & Co. v. Zac Smith Stationery Co.*, 130 So. 545, 546 (Ala. 1930) (rejecting defendant corporation's claim that individual it employed was an independent contractor who was not authorized to purchase goods on defendant's behalf from plaintiff; contract between defendant and individual expressly designated the latter as the former's agent and provided that his "work was under the complete control and supervision of defendant company with detail instructions as to the means to be followed"). Therefore, Dr. Benson's claims against Alteon may proceed to trial.[11]

---

[11] The Alteon employment agreements also state that, "during the performance of employment duties [under the contracts]," Dr. Jordan and NP Flanagin "shall devote substantially full attention and energies to the business of [Alteon] and shall diligently and faithfully serve [Alteon] in such capacity and other capacities as may be agreed upon in writing from time to time." (Doc. 71-4, p. 5, ¶ 2.16; Doc. 86-16, p. 1, ¶ 2). The agreements prohibit Dr. Jordan and NP Flanagin not only from holding "any other employment" but also from engaging in "any other activities whether compensated or uncompensated, which in the judgment of [Alteon] interfere with [their] duties and responsibilities set forth [in the Employment Agreement]," unless Alteon gives its express written consent. (Doc. 71-4, p. 5, ¶ 2.16; Doc. 86-16, p. 1, ¶ 2).

\*\*\*

Finally, because the Court did not rely on testimony from Dr. Joseph C. Sullivan, a board-certified neuro-radiologist disclosed as an expert witness by Alteon, NP Flanagin, and Dr. Jordan, (Doc. 74-1), to resolve the parties' summary judgment motions, Dr. Benson's *Daubert* motion, (Doc. 75), the joint motion from Alteon, Island Medical, and Dr. Jordan to strike exhibits to Dr. Benson's expert motion, (Doc. 85), are moot at this juncture. The parties may pursue these arguments during pretrial proceedings as motions *in limine*. *See generally Luce v. United States*, 469 U.S. 38, 40 n.2 (1984) (using the term motion "'in limine' … in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.").

## IV.

Based on the above, the Court grants Walker Baptist's motion for summary judgment on the EMTALA claim and dismisses that claim with prejudice. The Court enters judgment for Alteon, Island Medical, and Dr. Jordan on Dr. Benson's claim against Dr. Jordan for medical malpractice under Alabama law for allegedly failing to be involved or provide real-time supervision while he was in the emergency department before the end of his shift. The balance of Dr. Benson's claim against these defendants shall proceed to trial. Dr. Benson's *Daubert* motion the defendants' related motion to strike exhibits to the *Daubert* motion are moot.

36

The Clerk shall please TERM Docs. 75, 76, and 77.

**DONE** and **ORDERED** this September 26, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE